Rachel A. PORTER, Plaintiff–Appellant, Cross–Appellee,

v.

LIMA MEMORIAL HOSPITAL, Defendant–Appellee, Cross–Appellant.

Nos. 92–3009, 92–3017.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 8, 1992.

Decided June 3, 1993.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 3, 1993.

Robert P. Roth (argued and briefed), Portnoy, Leader, Pidgeon & Roth, Bloomfield Hills, MI, for plaintiff-appellant cross-appellee.

E. Thomas Maguire, Timothy R. Krugh (argued and briefed), Robison, Curphey & O'Connell, Toledo, OH, for defendant-appellee cross-appellant.

Before: MARTIN and MILBURN, Circuit Judges; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

On December 1, 1979, the automobile in which Liesl Fitzenrider was traveling spun out of control, bumped another car, and slid off the roadway. Liesl, then an infant three months of age, was thrown to the floor of the car while in the arms of her mother, Rachel Fitzenrider, now Rachel Porter, who has brought suit on her daughter's behalf. Rescue squad personnel examined Liesl at the accident scene and found nothing seriously wrong with her. A rescue squad member then held Liesl in his arms while Liesl and her mother were transported to defendant Lima Memorial Hospital (Lima), the hospital nearest the scene of the accident.

Plaintiff charged the attending doctor, Iqbal Singh, and the Lima staff with negligence in allowing Liesl's initial spinal injury to degenerate and cause paralysis. Plaintiff won a 4.2 million dollar verdict in an initial trial, but the trial judge, while denying Lima's motion for a judgment notwithstanding the verdict, ordered a new trial. During the second trial, the jury found Lima not liable for plaintiff's tragic injuries. Mrs. Porter, on behalf of Liesl, appeals the grant of a new trial in the first trial and charges error with respect to the second trial. Lima cross-appeals the denial of judgment n.o.v. in the first trial. Jurisdiction is appropriate based upon diversity of citizenship.

The injury was initiated in a Volkswagen Beetle driven by Mrs. Porter's friend. The rescue squad took Liesl to the Lima emergency room where she lay on a hospital table awaiting examination by emergency room physician, Dr. Singh. Registered nurse Pam Ogelsbee took Liesl's vital signs, and recorded them on the medical chart. She reported them to Dr. Singh, upon his arrival, for examination and treatment.

At this point, the only observable sign of injury was a small bruise or hematoma on the right side of Liesl's head. Nurse Ogelsbee reported this, too, to Dr. Singh, and he then assumed primary responsibility for treating Liesl. Dr. Singh found all of Liesl's extremities functioning normally and ordered several laboratory tests and numerous x-rays. He did not, however, order any spinal x-rays and failed to diagnose spinal instability. Nurse Ogelsbee did not repeat the vital signs during or after Dr. Singh's examination, claiming that she received no doctor's instructions in this regard. After reviewing the x-rays and lab tests, Dr. Singh discharged Liesl and provided her mother with written instructions concerning her head injuries.

After Dr. Singh discharged Liesl, she and her mother remained at the hospital while awaiting a ride home. During a period of more than two hours, Liesl apparently displayed no additional signs of serious injury which were observed by her mother. Mrs. Porter did report to one of the nurses at Lima a short period of irregular breathing. The nurse examined Liesl, determined that nothing was wrong, and returned Liesl to her

mother. The mother (Mrs. Porter) made no further inquiries; she testified that the nurse told her that "babies just breathe funny." [1] When she reached her home, the mother noted that Liesl's condition was worsening and she then took Liesl to Defiance Hospital, where doctors determined, for the first time, that Liesl's legs were not moving. They ordered numerous x-rays and lab tests, and eventually another hospital staff doctor diagnosed a subluxation at her first and second lumbar vertebrae, which resulted in Liesl's paralysis from the waist down. The experts who testified in the trials apparently agree that Liesl suffered paralysis sometime after Dr. Singh's examination and before her arrival, hours later, at Defiance Hospital.

■ Dr. Singh was the only person authorized to (1) conduct a medical examination; (2) order medical treatment and diagnostic studies; (3) arrive at a diagnosis; and (4) order hospitalization or discharge.[2] Consequently, the experts also appear to agree that Dr. Singh was the primary person who could have prevented the spinal injury by diagnosing Liesl's unstable spine before it became critically injured. Dr. Singh has settled this medical malpractice case for $2,500,-000.

We shall apply Ohio medical malpractice law in our review of the denial of judgment n.o.v., as well as the grant of a new trial, and with respect to claimed error in the second trial.

## I. *PROXIMATE CAUSE*

■ Proximate cause is the crucial issue upon which Lima's asserted liability depends. There is evidence that both Dr. Singh and the Lima nurses breached a duty of care, and this evidence of negligence is sufficient to survive Lima's motions for judgment n.o.v. or for a new trial. The pertinent question is whether the nurses' conduct proximately caused Liesl's paralysis. This case presents close and difficult questions of hospital liability. We recognize some difficulty of proof because of an inexplicable delay of nine years before this suit was commenced.

The legal requirements for proximate cause showings in Ohio are clear and they are strict. In order to prove proximate cause, "plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused the [injury]." *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971) (emphasis in original). The court defined "probability" as "that which is more likely than not ... [p]robable is more than 50% of actual." *Id.* 272 N.E.2d at 104. Ohio courts have consistently reaffirmed *Cooper* as stating the current law on proximate cause in malpractice actions.[3] *See, e.g., Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990); *Shumaker v. Oliver Cannon & Sons, Inc.,* 28 Ohio St.3d 367, 504 N.E.2d 44 (1986); *Galletti v. Burns Int'l,* 74 Ohio App.3d 680, 600 N.E.2d 294 (1991).

Ohio courts have strictly construed the requirement of probability, and have demanded that expert testimony meet this standard to sustain the necessary showing of proximate cause. Plaintiff vigorously contests "the proposition that the law requires specific magical words out of an expert witness which state that a nurse's negligence was, in probability, a proximate cause of Plaintiff's injury." (Appellant's Reply Brief at 2–3.) Although perhaps not requiring "specific magical words," we do interpret Ohio law as requiring expert testimony to be in terms of probability.

In *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97 (1971), the plaintiff had died from head injuries sustained when a truck hit him while riding his bicycle. For purposes of appeal, the court assumed the evidence was sufficient to show that the treating physician had been negligent in not diagnosing a serious

---

**1.** The nurse could not recall whether she made this comment.

**2.** Ohio law prohibits nurses from performing these tasks because they constitute the practice of medicine. *Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990).

**3.** Other courts have criticized *Cooper; see, e.g., Ehlinger v. Sipes,* 155 Wis.2d 1, 454 N.W.2d 754 (1990); *Wollen v. Depaul Health Center,* 828 S.W.2d 681 (Mo.1992).

head injury and in not operating pursuant to that diagnosis. The critical issue of proximate cause revolved around whether the patient would have survived even if the doctor had diagnosed the problem and ordered the operation. Addressing plaintiff's chances of survival, the expert testified that "the condition from which Theodore Cooper died had practically a 100% mortality rate without surgery ... 'there certainly is a chance and I can't say exactly what—maybe some place around 50%—that he would survive with surgery.'" *Id.* 272 N.E.2d at 104. Noting that the expert conditioned his opinion with the words "around" and "maybe," the court concluded that an inference that survival was probable was no more legitimate than an inference that survival was unlikely. *Id.* The court held that the testimony was insufficient under Ohio law to allow a reasonable juror to infer proximate cause.

In *Shumaker v. Oliver B. Cannon & Sons, Inc.,* 28 Ohio St.3d 367, 504 N.E.2d 44 (1986) (per curiam),[4] the plaintiff contended that exposure to various chemicals at work caused his terminal cancer. Plaintiff's expert had testified that "with a reasonable degree of probability, it is likely that this combination of those three chemicals *could* have caused the cancer." *Id.* 504 N.E.2d at 46 (emphasis by the court). The court held that this testimony fell below the level of certainty required of medical experts in Ohio, and, furthermore, found the trial court to be in error in admitting this evidence. The plaintiff's verdict was accordingly reversed.

"[P]ast cases have uniformly held that in order for the claimant's medical testimony to create a question of proximate cause for the jury, the testimony must establish a probability, not a mere possibility, of such a causal connection." *Galletti v. Burns Int'l,* 74 Ohio App.3d 680, 600 N.E.2d 294, 296 (1991). The use of phrases such as "could be," "could very well be," or "could possibly be," is generally fatal to allegations of proximate causation. *Id.*

In examining the conduct of the nursing staff at Lima, we have searched the record

carefully with the Ohio proximate cause requirements in mind. The plaintiff has alleged a breach of duty in four respects: (1) failure to repeat the vital signs and to report this to Dr. Singh; (2) failure to take Liesl's blood pressure; (3) failure to notify Dr. Singh about the baby's short period of abnormal breathing; and (4) failure to immobilize Liesl. We conclude that plaintiff provided insufficient evidence on proximate causation relating to allegations (2) and (3). Consequently, we now look to evidence relating to proximate cause as to the nurses' failure to immobilize Liesl and the failure to repeat vital signs.

After the accident, Liesl was not immobilized while being transported to Lima. Dr. Singh did not direct that she be immobilized at any time while examining, testing, and treating her, but notes that she was moving her extremities. Liesl demonstrated no signs of paralysis while he was examining her, and this would seem to eliminate any failure of this kind, which may have previously occurred, as a proximate cause of the paralysis. The experts on both sides generally agreed that the Lima nurses had no independent duty, apart from a doctor's instructions, to immobilize the infant. Plaintiff's expert, Dr. Peter Hall, however, testified that Lima nurse Oglesbee, as well as Dr. Singh, fell below the acceptable standard of care in not immobilizing Liesl, but he had no opinion as to whether the nurse's failure constituted proximate causation because "it was primarily the responsibility of the physician to maintain immobility of the patient." Significantly, he added: "If she [Liesl] arrived moving all extremities, and if the physician saw her moving all the extremities, then I would have to say that she would not be responsible for the spinal cord injury in this situation. I think it was primarily the physician's responsibility."

Dr. Hall changed his original, unequivocal opinion that the Lima nurses acted appropriately in the care of Liesl, but he made it clear, nonetheless, that the doctor was the

---

4. Two judges joined the opinion, two joined the judgment only, and three judges dissented. All judges agreed, however, that *Cooper* governs. The only dispute was whether the testimony rose to the level required by *Cooper.*

ultimate person responsible from the standpoint of proximate cause:

Q. Now, Doctor [Hall], generally speaking, it's the role and responsibility of the emergency room physician to determine the patient's medical diagnosis and then to order the necessary and appropriate medical treatment, is it not?

A. Yes, it is.

Q. And Doctor, in this case, where the emergency room doctor did not diagnose any spinal cord injury and discharged the baby after examining and x-raying the infant, you're not criticizing the nurses for not diagnosing and treating the spinal cord injury, are you?

A. That's correct.

Q. And that's because it was Dr. Singh's role and responsibility to do that, correct?

A. Yes.

Q. And what you're telling the jury is that, in your opinion, it was Dr. Singh who was responsible for treating Liesl's spinal cord injury, or at least he was responsible for ordering Liesl to be immobilized and hospitalized for further care and work up, isn't that the thrust of your testimony in this case?

A. Yes.

Q. So you are not saying that the conduct of the nurses or other hospital personnel caused any permanent harm or injury [to Liesl Fitzenrider], are you?

A. That's correct.

Dr. Robert D. Aranosian, another of plaintiff's experts, opined that the Lima nurses should have repeated vital signs. Like Dr. Hall, however, he believed it was Dr. Singh's failure rather than the nurses' failure to repeat vital signs or to immobilize Liesl that proximately caused Liesl's injuries:

Q. Okay. And it's your testimony that Dr. Singh should have ordered Liesl to be immobilized [sic] after she arrived at the emergency room, isn't that correct?

A. Yes, sir.

Q. And it's your opinion that as far as responsibility for ordering immobilization in the emergency room in 1979 that would be the duty of the emergency room physician involved in the care of the patient, isn't that true?

A. Yes, sir.

Q. And it's also true—now, generally speaking, I will go on. Now, generally speaking, isn't it the real object and responsibility of the emergency room physician to determine the patient's medical diagnosis and then to order the necessary and appropriate medical treatment?

A. Yes, sir.

Q. And, Doctor, in this case, where the emergency room doctor did not diagnose any spinal cord injury and then discharged the baby after examining and X-raying the infant, you certainly are not criticizing the nurses for not diagnosing and treating the spinal cord injury, are you?

A. Well, that's correct. I mean, the nurse would not make the diagnosis on the child. That's correct.

Q. And that's because it was Dr. Singh's role and responsibility to determine the medical diagnosis and then order the necessary and appropriate medical treatment, isn't that correct?

A. Yes, sir.

Dr. Samuel Kiehl's testimony as to vital signs was to the same effect. Still another of plaintiff's experts, Dr. Kytja Voeller, was even more specific in stating: "I don't think the vital signs had any causal relationship" to the paralysis.

## II. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

In diversity actions, state law governs grants and denials of motions for judgment n.o.v. *Toth v. Yoder Co.,* 749 F.2d 1190, 1194 (6th Cir.1984). In Ohio:

[A]fter construing the evidence most strongly in favor of the party against whom the motion is directed, [the court] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Ohio Civ.R. 50(A)(4). The standard for granting a judgment n.o.v. is identical to the standard for directing a verdict. *Chemical Bank of New York v. Neman,* 52 Ohio St.3d 204, 556 N.E.2d 490, 493 (1990). In deciding the motion, the trial judge may not weigh the evidence or assess the credibility of witnesses, and must deny the motion if a reasonable juror could find for the non-movant. *Cardinal v. Family Foot Care Centers, Inc.,* 40 Ohio App.3d 181, 532 N.E.2d 162, 164–65 (1987).

■ The great weight of the evidence supports the view that the nurses had no duty to immobilize the patient, but weighing evidence is not the court's function when determining whether to grant a judgment n.o.v. When bound to construe all the evidence in favor of the plaintiffs, it is conceivable that a reasonable juror might find for the plaintiff. Although a close question, we conclude that the district court did not err in denying Lima's motion for judgment n.o.v.

### III. *LIMA'S MOTION FOR NEW TRIAL ON BOTH LIABILITY AND DAMAGES AT THE FIRST TRIAL*

■ The district court cited six reasons for granting a new trial,[5] but discussed in detail only the lack of sufficient evidence to allow the jury to reduce damages to present value. This reason bears upon a new trial on damages, not on liability.

Granting a new trial on the issue of Lima's liability (as well as on the question of damages), the district court said: "With regard to the hospital's [Lima's] liability incurred as the result of the negligence of the nurses, this court is of the opinion that the result reached is against the manifest weight of the evidence." The district court also found that it had erred by refusing to submit proposed jury instruction 8(A), requiring the jury to identify the nurses' negligent acts. We are satisfied that the grant of a new trial was proper under the "manifest weight of evidence" rationale.

■ In this diversity case, the question of whether a new trial should be ordered is determined with reference to federal procedural law. *Toth v. Yoder Co.,* 749 F.2d 1190, 1197 (6th Cir.1984). We review the decision to grant a new trial on an abuse of discretion standard. *Id.; Duncan v. Duncan,* 377 F.2d 49, 53 (6th Cir.), *cert. denied,* 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967). An "[a]buse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir.1989).

When faced with a challenge directed at the weight of the evidence, the trial court's obligation is to

> compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences could have been drawn or because other results are more reasonable.

(citations omitted). *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1467 (6th Cir.1991); *accord, Bondie v. BIC Corp.,* 947 F.2d 1531 (6th Cir.1991). While the district court supplied no helpful analysis to support its conclusion that the finding of negligence against the nurses was contrary to the great weight of the evidence, we are satisfied that there was no error in reaching that conclusion.

Much of the proof in the case was devoted to Dr. Singh's actions, and there was ample evidence that it was the doctor's responsibility to direct the nurses and to decide which tests, examinations, x-rays, and other relevant data should be obtained to assist him in

---

**5.** The district court granted a new trial because: (1) the jury's finding of nursing negligence was against the manifest weight of the evidence; (2) the district court erred by failing to submit jury interrogatories 3(A) and 8(A) (asking the jury to state specifically which acts, if any, deviated from the standard of care); (3) the district court erred by submitting a "laundry list" of items recoverable as general damages; (4) plaintiff presented insufficient evidence from which the jury could have reduced the damages to present value; (5) the plaintiff failed to reduce lost wages to present value; and (6) the district court erred by failing to admit defendant's annuity chart.

his examination and treatment of Liesl. The evidence pointing to responsibility on the part of Lima was vague and inconclusive, and was generally contradicted and fully countered by other proof bearing upon Lima's liability. We have highlighted the weakness of the proof showing a proximate causation relationship between the paralysis and the conduct of Lima's personnel.

We have already concluded that the evidence was insufficient as a matter of law to support a finding of negligence on the other challenged breaches of duty. As we have previously indicated, under Ohio law, the plaintiff was required to produce expert testimony proving that the nurses' negligence was more likely than not the cause of the paralysis. Having carefully examined the voluminous testimony of the experts in both sides, we now conclude, as did the district judge who heard or reviewed that testimony, that the finding that the Lima nurses proximately caused the paralysis was against the manifest weight of the evidence. We are left with no "definite and firm conviction" that the trial judge erred in concluding that the great weight of the evidence formed no basis for finding that the nurses, in probability, caused the paralysis. Consequently, we conclude that the trial judge did not abuse his discretion in granting a new trial based on the weakness of plaintiff's proximate cause proof.

In reaching this conclusion, we have considered the effect of the nurses' failure to repeat the vital signs. The original vital signs (of which Dr. Singh was aware) were abnormal for a three month old infant.[6] The causal chain allegedly connecting the nurses' failure to repeat vital signs to the paralysis is tenuous at best. First, plaintiff contends that evidence of continued abnormal vital signs might have led Dr. Singh to diagnose tachycardia (a form of shock). Although the tachycardia was not shown to be related to the eventual paralysis, plaintiff contends that Dr. Singh might have admitted Liesl for further observation had he diagnosed tachycardia, and he might have ordered immobilization.

As pointed out previously, Ohio law requires proof of proximate cause by a showing of probability as a matter of medical opinion. Each link in the chain of proximate causation must be established by a probability.

It is not clear, however, and proof is lacking, that Dr. Singh would have admitted and immobilized Liesl even if he knew the abnormal vital signs persisted. Only two experts testified on the effect of the nurses' failure to repeat the vital signs. When asked what effect the failure to repeat the signs had on the final outcome, Dr. Aranosian testified that, "repeating vital signs, and coming up with vital signs that did not fit this child, *might* have led Singh to a spinal contusion." This testimony falls short of the required probability, and was legally insufficient to establish a causal connection between the failure to repeat vital signs and the eventual paralysis.

Dr. Hall's testimony is also ambiguous. In explaining his specific testimony about shock and paralysis, Dr. Hall stated:

The tachycardia itself, the shock—and I suspect this patient was in a mild degree of shock—the shock itself did not hurt the patient. And I think that's what I was alluding to....

The shock was simply ... a warning sign that there was a potential for something wrong. *Had that been followed up on,* had the patient been admitted to the hospital and the diagnosis been made, it obviously would have had an outcome.

... I believe that *had these abnormal vital signs been acted upon,* a more severe injury would have been recognized.

Essentially, Dr. Hall's testimony was that repeating vital signs *may* have afforded Dr. Singh the opportunity to diagnose tachycardia and admit Liesl to Lima. Had Dr. Singh actually made that diagnosis ("had these abnormal vital signs been acted upon"), Liesl probably would not have become paralyzed. Neither Dr. Hall nor any other witness testified that Dr. Singh *probably* would have diagnosed tachycardia. No witness ever di-

---

6. Defendant's proof indicates that the abnormali- ty was not great.

rectly addressed this crucial link in the causal chain.

We find the evidence linking the failure to repeat vital signs to the paralysis unclear, unconvincing, and legally insufficient under the strict Ohio standards. In any event, we are not left with the "definite and firm conviction" that the trial judge erred in concluding that the evidence of failure of the Lima nurses, absent any doctor's direction, would support the required causal chain.

In summary, the trial judge did not abuse his discretion in granting a new trial on the basis of the manifest weight of the evidence. We note that a more detailed finding in this regard by the district court would have been of assistance to this court.

Accordingly, we affirm the trial judge's grant of a new trial on liability. Having done so, we have no reason to consider the question of a new trial on the issue of damages.

## IV.  *SECOND TRIAL*

■ Judge Walinski, who presided over the first trial and who granted the new trial, recused himself from hearing the second trial. During the second trial, Judge Potter allowed Dr. James E. Wilberger, M.D., a well-qualified pediatric neurosurgeon, to give proximate cause testimony over plaintiff's objections. Dr. Wilberger testified that even if the nurses had repeated the vital signs and told Dr. Singh about the abnormal breathing, Dr. Singh could not have diagnosed the spinal infirmity. Because the additional knowledge, in his opinion, would not have permitted a diagnosis of spinal injury, Dr. Wilberger concluded that the nurses' failure to inform Dr. Singh of the vitals and the breathing difficulty was not a cause of the paralysis.

Dr. Wilberger admitted not knowing the standard of care for emergency room nurses in 1979. Plaintiff maintains that without knowing the standard of care for emergency room personnel, Dr. Wilberger was unqualified to give an opinion on what may have happened had the alleged Lima breaches not occurred. Plaintiff misconstrues Dr. Wilberger's testimony. Dr. Wilberger did not testify that Dr. Singh would or would not have admitted Liesl if he had known the additional information. Dr. Wilberger merely testified that the additional information, in his opinion, could not have signaled a spinal problem, or any other reason of which Dr. Wilberger knew, for admitting Liesl under all the circumstances.

■ The trial court has broad discretion in admitting or excluding expert testimony. A trial judge's decision in this respect must be sustained unless manifestly erroneous. *Mayhew v. Bell S.S. Co.*, 917 F.2d 961 (6th Cir.1990). We find no demonstrable error in allowing Dr. Wilberger's testimony. In any event, his decision that Dr. Wilberger was qualified to testify was not "manifestly erroneous." Even if erroneous, the admission of Dr. Wilberger's testimony was not so prejudicial as to significantly impair plaintiff's right to a fair trial.

■ Lima's counsel stated during opening statements at the second trial: "When plaintiff's expert witness first testified, they blamed Dr. Singh for Liesl's paralysis. But now in this trial they are trying to turn all the facts around. And now the evidence will show they are going to try to blame everything on the nurses." The plaintiff immediately moved for a mistrial, and the defendant contended that references to prior testimony were permissible to impeach by showing inconsistency in anticipated expert testimony. The district court denied the motion for a mistrial.

In some circumstances, reference to a prior trial may work an unfair prejudice. It is unclear exactly how reference to the earlier trial may have prejudiced the plaintiff. There was, of course, no reference to the jury verdict in the first case and no reference to the final outcome. The opening statement referred only to prior testimony, which might have been deposition testimony. We find no reversible error in allowing the trial to proceed under all the circumstances.

Overall, then, we conclude that the district court did not commit error in denying Lima's motion for judgment n.o.v. Although plaintiff's evidence was weak and inconclusive, particularly on proximate cause, when constrained by the rigid standards for granting judgment n.o.v., defendant was not entitled

to judgment as a matter of law. Nor did the district court commit error by granting a new trial based on the manifest weight of the evidence. Additionally, we find no basis for plaintiff's claim of reversible error in admitting evidence in the second trial and we believe the second trial was essentially a fair one. Consequently, plaintiff was not entitled to a mistrial.

Accordingly, we **AFFIRM** the district court in all respects.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring.

I join in Judge Wellford's opinion except for the sections which discuss Lima Hospital's motion for a judgment notwithstanding the verdict. The only issues which we are called upon to review are: (1) whether the district court abused its discretion in granting the hospital a new trial; and (2) whether there were any errors in the second trial which would warrant our reversal of the judgment entered following that trial. I do not believe that we need to consider whether the hospital should have received a judgment notwithstanding the verdict following the first trial because we conclude that the district court did not abuse its discretion in granting the new trial. Under Rule 50 of the Federal Rules of Civil Procedure, so long as the proper motions are made at the appropriate times, a district judge may grant a new trial as an alternative to issuing a judgment notwithstanding the verdict. When a district court decides to grant a new trial, I do not believe that we should review the district court's refusal to grant the alternative motion for judgment notwithstanding the verdict. I would therefore omit the references to the hospital's motion for judgment notwithstanding the verdict because they are unnecessary for our decision. In all other respects I join the opinion of Circuit Judge Wellford.